Thompson Land & Coal Company v. Commissioner.
Thompson Land & Coal Co. v. Commissioner
Docket No. 26495.
United States Tax Court
1951 Tax Ct. Memo LEXIS 140; 10 T.C.M. (CCH) 761; T.C.M. (RIA) 51227; August 15, 1951
*140 R. A. Littleton, Esq., 1021 Tower Bldg., Washington, D.C., for the petitioner. Lyman G. Friedman, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves income tax for the calendar year 1945. Deficiency was determined in the amount of $774.23. The whole amount is in dispute. The only question presented for determination is whether the Commissioner erred in allowing depletion on percentage basis under section 114(b)(3) of the Internal Revenue Code, instead of on a basis of value at March 1, 1913, as contended for by the petitioner. Findings of Fact Petitioner is a corporation with its principal place of business in Charleston, West Virginia. At or about March 15, 1902, the petitioner acquired one contiguous boundary of land in Clay County, West Virginia, consisting of approximately 9,220 acres of land, together with the oil and gas rights therein. The country was very rugged, and mountainous. Petitioner was organized by the executors of the estate of Moses Thompson, deceased, in connection with the settlement of said estate. The stock and securities of petitioner were issued in exchange *141 for the land and mineral properties transferred to it by the executors of the estate of Moses Thompson, deceased, and the stock and securities so issued were distributed to the beneficiaries under the will of Moses Thompson. The petitioner has owned the 9,220 acres at all times since 1902. A few small tracts within the perimeter of the 9,220 acres are not owned in fee by the petitioner. Prior to March 1, 1913, the petitioner executed leases for oil and gas purposes upon portions of the 9,220 acres as follows: (1) On March 4, 1909, 1,200 acres was leased for a period of 20 years to United Fuel Gas Company. The lease provided for payment of royalty to the lessor of one-eighth of oil produced and a royalty of $200 per annum for each producing gas well; also for the payment for $1,200 per annum as rental, the royalties to be credited upon the rentals, in each year; (2) on July 25, 1908, about 397 acres was leased for 20 years to United Fuel Gas Company. The leases provided for royalty of one-eighth of oil produced and a royalty of $200 per annum for each gas well; also for $400 per annum rental, against which royalties should be credited in each year; (3) on December 1, 1909, about *142 7,848 acres was leased to Edgar M. Moore for a period of ten years. The lease provided for royalty of one-eighth of oil produced and a royalty of $250 per year for each producing gas well; also for an annual rental of about $5,900 per year against which any royalties were to be credited. The three leases were all in existence on March 1, 1913, but have since been surrendered or have expired. Each provided that the lessor could annual the lease at any time by making all payments then due. On March 1, 1913, there had been no drilling on the petitioner's property under the leases, and no oil or gas had been discovered on petitioner's property. The first production on the petitioner's property was about 1923 but it was not connected into the lines until 1926 which was the first year Thompson Gas Company (one of the lessees of the property) received gas on any wells. On March 1, 1913, there was an oil field called Birch Run Oil Field from three to five miles west of the petitioner's property where there was production of from five to fifty barrels of oil a day. The petitioner's property consists in general of four parts. The first part, approximately 4,600 acres on the east side, has *143 since March 1, 1913, been developed with about 34 gas wells. Another portion on the south consisting of about 100 acres and called the Zogg lease has since March 1, 1913, been developed by two gas wells, and about 100 acres on the extreme west end of petitioner's property known as the Davis property has since March 1, 1913, been developed by a producing oil well and two gas wells. About 4,400 acres has been tested for gas by a number of wells but has been abandoned. The property is now operated under three leases, to Thompson Gas Company as to about 4,600 acres, Davis Oil Company as to about 100 acres, and Zogg Oil & Gas Company as to about 100 acres. The gas reserves under the property leased to Thompson Gas Company are estimated to be 11,396,802,000 cubic feet of which 4,085,000,000 were estimated to have been extracted up to December 31, 1944. The record does not show reserves or extractions as to the Zogg or Davis leases. There is a strong similarity between the different parts of the geological regions known as the Appalachian Oil and Gas Field of West Virginia, including Clay County and Harrison County, West Virginia, which are separated by about 40 miles airline. Oil and gas *144 interests were sometimes offered at public sales. Prices ranged from $5 an acre to $1,000 an acre, depending upon conditions. One thousand dollars an acre might be paid for property offsetting a good well. The petitioner claimed cost depletion of $5,717.43 based on 635,270,000 cubic feet of gas at nine cents a thousand; the respondent allowed percentage depletion on a basis of 27 1/2 per cent in the amount of $2,620.49, upon gas royalties reported, of $9,529.05. Opinion The only question propounded to us here is whether depletion should be allowed on the percentage basis provided by section 114 (b) (3), or upon the basis of March 1, 1913, value of the properties involved, within the intendment of sections 23 (m) and 113 (a) (14) and (b) of the Internal Revenue Code. The effect of such provisions is to allow the petitioner to compute depletion either upon a percentage basis of 27 1/2 per cent or upon the basis of cost, or in case of acquisition prior to March 1, 1913, upon the basis of fair market value at March 1, 1913. The parties do not disagree as to the amount of gas production in 1945 and, in effect, agree that it was 635,270,000 cubic feet. The petitioner reported gross *145 income from gas royalties in the amount of $9,529.05 and claimed cost depletion at nine cents per thousand cubic feet in the amount of $5,717.43. This was based upon claim of a March 1, 1913, value of $90,000 for the property. Respondent allowed depletion at 27 1/2 per cent upon the $9,529.05, or $2,620.49, and disallowed the remainder of the $5,717.43. The matter sums itself up into the question as to what was the value of the properties on March 1, 1913. The petitioner contends for a value of $10 per acre and the respondent argues that no value has been shown. The evidence is in an unsatisfactory condition. It consisted in effect, on the crucial point as to which there is disagreement, of the testimony of the petitioner's president who was an attorney, and of another witness. [1] Neither was a geologist and neither was conversant with the property on March 1, 1913. Petitioner's president became interested in it about 1943 and acquired his stock interests in 1945. He had in 1915 been physically upon the property. Much of his testimony was based upon statements from others. He gave an opinion of $10 an acre as a valuation but his experience was largely in an area some 50 miles away *146 and though general conditions were in his opinion comparable in both sections it is obvious, we think, that considering the fact that the country was very rugged and values ran from $5 to $1,000, depending upon conditions, his opinion of value as of March 1, 1913, for this property can not be given weight. The other witness had been a notary public with a buyer of leases in the general vicinity of the petitioner's property. The date of such experience on his part is indecisive, under the record. Though he testified that he first became acquainted with the lands in 1912 or 1913 "along there," he later said that it was "In 1914 and 1915 and from then on," and that he had no experience prior to 1913. Still later he says that experience began the latter part of 1912. Again asked when he acquired oil and gas royalties in the vicinity of the Thompson property he replies "In 1916." We conclude that no showing is made that his experience was as early as March 1, 1913. Moreover, he testified that he did not buy anything, that is, any oil or gas royalties or real estate for himself or clients in the vicinity of Thompson Land & Coal Company prior to 1913 or in 1913, and though he gave an opinion *147 of a value of $10 to $12 an acre for land for oil and gas as of March 1, 1913, he testified that he was referring to a case where an anxious purchaser comes along who is very much interested in a specific piece of property, and that his opinion was based upon his knowledge of wells being located "some five or seven miles away from the Thompson land on March 1, 1913." Though he said he was familiar with the geology of the region he further stated that he made no examination to determine it and that he was talking about the opinion of a state geologist. He stated that the rock was the same on the surface (on the Thompson land and the land about five miles away) and that that was the extent of his examination; also that he never worked around the drilling of wells upon the Thompson property. It is obvious that he was not qualified to state the oil and gas value of this property on March 1, 1913. It is equally clear, we think, that the fact of production, several miles away, does not prove value in the property here involved, on the crucial date. Though upon brief the petitioner does in *148 fact not rely upon the rentals payable upon the property for 1913 as demonstrating value on March 1, 1913, we note that the three leases provided for royalties for gas wells of only $200 per year per well as to two leases and $250 per year per well as to the other, and that these amounts were to be credited against rentals under the leases which were about $7,500 per year. The leases, however, could be annulled at any time by paying amounts then due. Oil is an element of little importance and little relied upon in this matter. Under these circumstances we think it apparent that the rentals or royalties payable under the leases were not such as to indicate a value on March 1, 1913, which would justify depletion in an amount greater than that allowed, on a percentage basis, by the Commissioner. The respondent's determination of deficiency based upon percentage depletion must therefore be sustained unless as petitioner suggests, citing Helvering v. Taylor, 293 U.S. 507, the Commissioner's determination was arbitrary. We find nothing arbitrary therein. The deficiency notice shows that the 27 1/2 percentage depletion was allowed because of failure to establish fair market *149 value as of March 1, 1913. The statute provides for such percentage depletion unless cost depletion or depletion based upon March 1, 1913, value is greater, and the allowance of the percentage depletion as by statute provided seems the opposite of arbitrary, in the absence of further showing. That showing was, of course, the petitioner's burden. We conclude and hold, therefore, that petitioner has not shown error on the part of the Commissioner in the determination of the deficiency involved. Decision will be entered for the respondent. Footnotes
1. There is in effect no disagreement about the evidence of another witness, as to reserves.↩